(No. 1607, March 21, 1914)

IN THE MATTER OF THE PROCEEDINGS LOOKING TO THE DISBARMENT OF A. B. RENEHAN.

### SYLLABUS.

1. In a proceeding looking to disbarment, where the evidence fails to show that the relation of attorney and client existed, an attorney at law in his dealings with a party in a business transaction is under no greater obligation to the party with whom he deals than a person not an attorney would be.

P. 651

2. Where the court in a disbarment proceeding finds upon conflicting evidence, that the case has not been established against the respondent by a preponderance of evidence, the charges against respondent will be dismissed.

P. 658

Original in Supreme Court. Information Dismissed.

### STATEMENT OF THE CASE.

This is a proceeding on an information against Alois B. Renehan for disbarment, filed by the attorney general in

accordance with the recommendation of the State Board of Bar Examiners of the State of New Mexico, under and by virtue of Chapter 53, Session Laws of 1909 of New Mexico. The information contains three charges, all of which allege that said Renehan, being at all times therein specified, duly admitted to practice law before this court and the inferior courts of the State of New Mexico, has practiced mischief and deceit, has been unfaithful to the court and his clients, is unworthy of public confidence, and has not demeaned himself as an attorney in the courts of this state uprightly and according to law, and has committed acts to which disbarment, as a consequence, is attached.

The first charge, in effect, alleges that by virtue of a certain decree in the district court of Rio Arriba county, in cause number 624, entitled Jose Isabel Martinez, et al., against George Hill Howard et al., which was an action to quiet title and to partition the Juan Jose Lovato Grant, and that in said suit, the east three-fourths of the south half of said grant was set apart to the heirs and legal representatives of said Juan Jose Lovato in fixed proportions; said charge further alleges that all of said heirs executed a power of attorney to one George Hill Howard empowering him to sell their interests in said grant, and that the said Howard in executing said power of attorney conveyed to the New Mexico Irrigated Lands Company for the sum of twenty thousand dollars, the east three-fourths of the south half of the Lovato Grant, hereinafter called the "heirs' tract," and that said company mortgaged said tract to said Howard to secure the payment of the purchase price; that upon the death of said George Hill Howard, by his will and subsequently by decree of court, his son, G. Volney Howard, was substituted as trustee for his deceased father, that said G. Volney Howard is still acting as such substituted trustee and has never been discharged; it further alleges that the said entire Lovato Grant was sold to Messrs. Tutt and Skinner of Colorado Springs, and that out of the proceeds of said sale the sum of twenty-four thousand dollars was to be applied to the purchase of the heirs' tract, and that said amount was to be distributed among

the heirs in the proportions stated in the decree of partition in said cause No. 624 in the district court of Rio Arriba county; that said George Hill Howard and his successor in trust, G. Volney Howard, were bound by the terms of the trust to pay to each of the *cestuis que transtants* his or her full share of the trust fund created by the sale of the said heirs' tract without diminution; that said Renehan, the respondent, represented said Tutt and Skinner, the purchasers, as their New Mexico attorney, and was fully acquainted with all of the foregoing facts; that thereafter, during December, 1908, January, February and March, 1909, said Renehan fraudulently, corruptly and by misrepresentations, contrary to his duty and obligations to his clients, and contrary to his oath of office as an attorney, caused and procured certain of the heirs of Juan Jose Lovato to employ him as their attorney and to execute to him assignments of their interests in said trust fund, by falsely and fraudulently representing to them that said George Hill Howard did not intend to deal fairly with them and did not intend to pay them all that was due them; and that he, said Renehan, controlled the grant and could easily obtain the money for them; that it was necessary for them so to assign their interests in the fund to him in order to collect the money due them as heirs and assigns of Juan Jose Lovato; that he, the said Renehan, well knowing the falsity of these statements, being fully aware and advised that under the terms of the trust, the substituted trustee, G. Volney Howard, was compelled to pay said heirs without diminution and would do so without the intervention of any attorney whatsoever; that said Renehan, the respondent, "prepared the assignments so procured by him to be signed by his clients as aforesaid, and falsely and fraudulently represented to them that each was entitled to a certain sum as his or her proportionate amount of the total realized from the sale of the grant  *  *  *  with intent to cheat and defraud them, and inserted in each assignment false amounts; whereas, in truth and in fact, his clients were entitled to amounts" much larger than those inserted in said assignments, "concerning which said Renehan was fully informed when he made such false and

fraudulent representations and inserted the said false and fraudulent amounts in the assignments, and that his said clients relying on his statements, without any knowledge of their falsity and believing them to be true and acting under his advice as their attorney, did each sign, execute and deliver to him during the months of January and February, 1909, an assignment of the amount due as represented to them by him; that said Renehan during the months of January and February, 1909, personally or through his agents, furnished a list of the heirs and assigns of the said Juan Jose Lovato, purporting truthfully to set forth the names of the said heirs and the amounts due each of them * * * whereas, in truth and in fact, the amounts listed were falsified and were much less than the actual amounts due them, and said Renehan having prepared assignments in the same manner and form and with the same fraudulent amounts inserted as above alleged, did procure through the efforts of T. B. Catron, an attorney-at-law of Santa Fe, New Mexico, and by means of the same false and fraudulent representations, assignments of nearly all of the remainder of the Lovato heirs, and having thereby secured said assignments, together with those of his clients, without the knowledge, authority or consent of the assignors, and with intent to defraud them, did fraudulently, wrongfully and unlawfully raise * * * " the amounts of said assignments, "and thereupon presented them to G. Volney Howard, substituted trustee as aforesaid, on or about the twenty-eighth day of April, 1909, and said substituted trustee thereupon paid over to said Renehan as assignee of the heirs named in said assignments, and as assignee for Antonio Faustin Lovato and others the sum of seventeen thousand six hundred and sixty-four dollars and twenty-five cents, and that at the time said G. Volney Howard was without any knowledge of the false and fraudulent practices of said Renehan as herein above set forth, by virtue of which said assignments had been obtained, and paid said amounts to said Renehan in complete ignorance of the fact that the assignors had been so deceived, defrauded and cheated." "That in the case of the assignments procured by said Catron, said Renehan

having procured the money paid him as aforesaid, and
having deducted therefrom the difference between the
amounts originally upon the assignments and the amounts
to which he had raised . said assignments, fraudulent-
ly, unlawfully and without right retained for, and ap-
propriated to, his own use and benefit said difference,
and the balance left after said deduction, said Renehan,.
paid to said Catron during the month of May, 1909; and
as to the remaining assignments said Renehan, without
the knowledge of his clients, fraudulently, unlawfully and
without right appropriated to his own use and benefit the
difference between the amounts originally shown in the
assignments and the sums to which he raised said assign-
ments as hereinbefore set out, and utterly failed to account
to his clients for the amounts so unlawfully appropriated by
him to his own use and benefit."

"That said respondent represented, as his attorney, one
Antonio Faustin Lovato, whose interest in the said grant.
as an heir, amounted to the sum of seven hundred and.
fifty dollars, and who had acquired an additional interest
by purchase from one Jose Maria Lovato of six thousand
dollars, and that said Renehan well knowing and being
fully informed that the said amounts were due to the said
Antonio Faustin Lovato, represented to him that he could
not recover the same without employing him and that
there was due him by virtue of his heirship the sum of
four hundred dollars, and by virtue of his purchase, the
sum of thirty-two hundred dollars, and that by the same
false and fraudulent representations, he prevailed upon
him to employ him, respondent,' to collect the amount
due him and having compromised and settled the claim
without suit with the said G. Volney Howard, who as at-
torney at law represented Jose Maria Lovato with respect
to the amount due Antonio Faustin Lovato on account of
his purchase from Jose Maria Lovato of his interest, for
the sum of five thousand dollars and having collected said
amount and having also collected the amount due the said
Antonio Faustin Lovato in behalf of his heirship interest
in said fund, in all amounting to five thousand seven hun-
dred and fifty dollars, did pay to the said Antonio Faustin

Lovato the sum of two thousand dollars, and falsely and fraudulently represented to him that that amount was all that was due him after deducting his fee,. and that said Renehan, contrary to his duty and obligation to his client and contrary to all right and equity, retained and withheld from his client, Antonio Faustin Lovato, and appropriated to his own use the sum of three thousand seven hundred and forty dollars."

"That by the aforesaid false and fraudulent representations and by said deceitful and corrupt practices, said Renehan fraudulently converted to his own use the sum of about two thousand eight hundred and forty dollars, which came into his possession by virtue of his employment as attorney  *  *  *  and unlawfully appropriated to his own use about the sum of one thousand nine hundred dollars from those who made assignments to him through the efforts of T. B. Catron, as above alleged, and that by means of said false and fraudulent representations he fraudulently converted to his own use the sum of three thousand seven hundred and fifty dollars which came into his possession by virtue of his employment as an attorney by Antonio Faustin Lovato, as above set forth."

The second charge need not be set out in full, but so far as it is material to this case alleged that, "as an attorney at law said Renehan was employed on the fifteenth day of December, 1909, by one Arthur H. Gossett, to represent the said Gossett in the district court of Rio Arriba County upon a charge of murder, the grand jury of said district court having indicted said Gossett for the said offense in the June, 1910 term of said court; that the said Gossett informed the said Renehan in the month of June, 1911, just prior to the trial of his cause at the 1911 term of the district court of Rio Arriba county, that there was a certain contract in existence which was executed on the 8th day of June, 1910, by one Silviano Roibal who was then and there the duly elected, qualified and acting sheriff of said county, for a money consideration, offered and paid him by one Elias Clark, of Alcalde, New Mexico, by virtue of which said contract the said Silviano Roibal certified and declared that he would see said Gossett free and

acquitted of the charge of murder then pending against him as aforesaid; that the said Renehan well knew that the intent of said contract and agreement was, that the said Silviano Roibal should corruptly, unlawfully and improperly influence the jurors who were selected, empanelled and sworn to try the said Gossett upon the charge of murder, as aforesaid, and said Renehan as an attorney at law, and the duly sworn officer of said court, well knew that such corruption and bribery of said officer of this court was unlawful and in contempt of said court, and by his failure to disclose said corruption and bribery to said court prior to the trial of said Gossett, thereby took an unlawful and corrupt advantage of said court, contrary to his oath of office as an attorney at law and in contempt of the dignity and authority of said court, it being then and there the duty of the said Renehan, attorney at law, to uphold and sustain the dignity and authority of said court and to prevent the corruption and bribery of an officer of said court, and then and there to disclose an attempt to corrupt the jury by such means, and especially not to take advantage of such corruption and bribery by remaining silent upon his discovery of the fact, and that the said Renehan by his failure to disclose said conditions and by going to trial with full knowledge of the existence of the contract and of its intents and purposes, gave his consent to it and to the corruption of an officer of the court, and took advantage of it, contrary to his oath of office and in contempt of that court."

Said second charge further alleges "that the trial in the month of June, 1911, resulted in a mistrial and the cause did not come up for trial again until November, 1912, and during all the time from June 1911, until November, 1912, said Renehan was fully informed and knew of the existence of the contract, but prior to the November, 1912 term of the court E. P. Davies, an attorney at law and a former partner of the said A. B. Renehan, disclosed to the District Attorney Alexander Read, the fact of the existence of the contract  *   *   *   and said Alexander Read went to said A. B. Renehan and told him that he knew about the contract and stated that he would discharge the

In re Renehan, 19 N. M. 640

petit jury which had been empanelled for the term; whereupon the said A. B. Renehan went to the said Gossett and advised him of the facts and that the first panel of the petit jury had been discharged because of the discovery by the District Attorney; that thereafter a new panel was called, which upon the trial of the cause, found the said Gossett not guilty and the court discharged him accordingly.''

The third charge alleged unprofessional conduct and prayed disbarment on account of certain actions of said respondent in the cause of Retsch v. Renehan, No. .................... in the district court of Santa Fe county, afterwards appealed to this court, cause No. .................... in said court. This charge was demurred to on the grounds, among others, that nothing therein showed unworthiness or infidelity as an attorney, which would subject respondent to the penalty of disbarment. This demurrer was at a former hearing of this cause sustained and is not now before us for consideration.

The respondent answered the first charge alleging, in effect, that he was not the attorney for the parties in question but acted only as a broker of Messrs. Tutt and Skinner who had purchased the Lovato Grant and that he took from the various heirs absolute assignments of their interests at prices agreed upon with them; respondent further answered that he practiced no deceit upon said Catron nor upon said Howard in his transactions with them regarding the assignment of these interests and that further as to the heirs of the Lovato Grant, who were his, the respondent's clients, he made a full and fair disclosure of all the facts in relation to his purchase of their interests and entered into a new contract with them for the sale of their interests in the grant.

The respondent demurred to the second charge of the information on the ground that the knowledge of said corrupt bargain was received by him as a privileged communication between attorney and client. This demurrer was overruled, and the defendant answered denying that he had any knowledge of such corrupt bargain prior to the first trial of the case at the June term, 1911, and further

alleging that upon learning of it after such term he informed the District Attorney, and through him the court, of such corrupt bargain and that the jury panel at the next trial of the cause was dismissed in consequence of such information. Upon the trial of the issue raised by the second charge, the state's witness, Gossett, was unable to testify positively that he informed the respondent of the aforesaid corrupt bargain before the first trial but testified that he could not say positively whether he so informed, Renehan before or after the first trial. Upon the failure of said Gossett to testify as to Renehan's knowledge of the corrupt bargain before the first trial of the case, the Attorney General dismissed the second charge against the respondent.

This then leaves only the first charge for the consideration of the court at this time.

## OPINION.

RAYNOLDS, District Judge—The charges in this case arose out of the sale of the Juan Jose Lovato Grant. The undisputed evidence shows that the title to this grant had been confirmed and the south half set apart to the legal heirs and representatives of Juan Jose Lovato; that later a suit for partition of the grant was brought, and that one-fourth of the south half was given to the attorneys as a fee for prosecuting such suit, thus leaving the east three-fourths of the south one-half of the grant to the heirs, whose fractional interests were shown by the decree of the court in said action; it further appears that all the heirs and assigns of Juan Jose Lovato gave to George Hill Howard a power of attorney to sell their interests in said east three-fourths of the south half known as the "heirs' tract," at a certain price per acre, and that after several attempts, said Howard finally sold the said heirs' tract to the New Mexico Irrigated Lands Company for the sum of twenty thousand dollars, and took a mortgage from said company to secure the payment of the money. The New Mexico Irrigated Lands Company never paid the purchase price, and at the time the entire grant was bought by Messrs. Tutt & Skinner, about December first, 1908, the mortgage and in-

terest thereon amounted in round figures to the sum of twenty-four thousand dollars. At the time of the pur-chase of the grant by Tutt & Skinner the purchasers did not pay cash, but gave their notes payable in one year, and also assumed the twenty-four thousand dollar mortgage on the heirs' tract.

The first charge may properly be divided into three di-visions, in regard to the respondent's relations to the Lo-vato heirs; first, as to those heirs who were neither clients of·respondent nor clients of Catron & Catron; second, as to such heirs as were clients of Catron & Catron; and third, as to those heirs who were respondent's clients.

As to the first set of Lovato heirs, the respondent testi-fied that he acted, not in the capacity of an attorney at law ·for them, but simply as a broker of Messrs. Tutt & Skinner, the purchasers of the grant, who had by such pur-chase assumed the mortgage of the New Mexico Irrigated Lands Company; that the purchasers had given their notes for the purchase price, due in one year, and that they were desirious of discounting those notes and closing out the matter for the smallest amount of money possible; that there was some discussion in regard to a proposed foreclos-ure of the mortgage but that it was finally decided to pur-chase the interests of the mortgagees, and, to effect this plan, the respondent undertook to buy the outstanding in-terests of the Lovato heirs under the mortgage. The testi-mony of the respondent as to the agreement with Messrs. Tutt & Skinner is corroborated by other witnesses and is not disputed, and in furtherance of this agreement and to carry out the plan made with Messrs. Tutt & Skinner, the respondent sent letters to his agents, enclosing blank forms of assignment for execution by the heirs. These assign-ments purported to convey to him the entire interest of the heir in the mortgage for which the heir agreed to ac-cept a certain amount, which was inserted in the assign-ments. These assignments were all in the same form, one of which reads as follows:

"Whereas, the undersigned, was awarded an interest in that part of the Juan Jose Lovato grant which was alloted by the decree of the court to the heirs of the grantee and

his assigns, and is commonly known as the "heirs' tract";
and

Whereas, the undersigned afterwards gave a power of
attorney to George Hill Howard to sell and dispose of
such interest; and

Whereas, afterwards the said Howard disposed of and sold
such interest but did not obtain the money for which it
was sold; and

Whereas, there is due to me after paying fees and com-
missions the sum hereinafter stated:

Now, therefore, in consideration of the premises, I, the
undersigned, hereby assign and set over to A. B. Renehan,
all my right, title and interest in the said "heirs' tract"
and any moneys due to me by said Howard, directly or in-
directly, for and on account thereof, and hereby empower
him to collect and recover  and adjust the same in such
manner as he may be advised, in my name or otherwise, at
his election, on condition as follows, to-wit:

1.    That this writing shall be deposited in the First
National Bank of Santa Fe, New Mexico, by me, with di-
rections to deliver the same to the said Renehan, or his
order, when, within ten days of the date of such deposit,
he deposits or causes to be deposited to my credit in said
bank, the sum of $287.50.

2.    In order to identify myself as the person rightfully
entitled to said payment and share I further  certify that
my father's name was Polito Lovato, that my mother's
name was Maria Antonia Garcia de Lovato, that the name
of my paternal grandfather was Ysidro Lovato, that the
name of my paternal grandmother was Beatris Lovato, that
the name of my maternal grandfather was Antonio Urvan
Garcia, and that the name of my maternal grandmother was
Maria Dolores Garcia.

3.    I hereby certify that I have not sold or assigned my
rights as against said Howard to any other person than the
said Renehan, and I admit that the said sum of money,
when deposited by the said Renehan, shall have been de-
posited by him to my credit on the strength and in reliance
upon the declarations in paragraphs 2 and 3 hereof.

4. The deposit by me of this writing with the said First National Bank of Santa Fe, New Mexico, shall be sufficient instruction to it to carry out the purposes thereof.

In witness whereof, I have hereunto set my hand this 24th day of February, 1909.

                              (Signed)     Marcelino Lovato.
TERRITORY OF NEW MEXICO,
    COUNTY OF RIO ARRIBA.          S. S.

On this 24th Day of February, 1909, before me personally appeared Marcelino Lobato to me well known to be the same person described in and who executed the foregoing instrument and acknowledged to me that he executed the same as his free act and deed.

In witness whereof, I have hereunto set my hand and notarial seal the day and year first written in this certificate.

                    (Signed)     Quinby A. Woodward.
                              NOTARY PUBLIC.

We hereby certify that we know the person whose name is signed to the foregoing assignment to be the same person he pretends to be.

                    (Signed)     Q. Woodward.
(Seal)              (Signed)     Tom Lobato.
Dec. _____, 1908."

An inspection of the above assignment shows that it is an absolute conveyance or sale to the respondent, which the owners of the respective interests in the grant had a right to make if they so desired, and the evidence as to this transaction, showing no relation of attorney and client between respondent and said heirs, the respondent was not charged with any duty when purchasing from these heirs, to make disclosure to them of the facts then within his knowledge.

The court is of the opinion that although the amounts due the respective heirs under the mortgage could probably have been collected from the substituted trustee, G. Volney Howard, without discount when the notes should become due and the mortgage paid, nevertheless these heirs had the right to sell their interests for cash at a discount to the respondent or any other person for the amount he

was willing to pay them and that they were willing to accept, and his purchase from the heirs of their interests in the mortgage, which Tutt & Skinner had assumed, is in no way improper and not ground for disbarment.

As to those heirs who were the clients of Catron & Catron, there appears to be a conflict in the evidence as to just what took place. It is admitted that copies of the assignments, as set forth above, were sent by the respondent and his agents to the various Lovato heirs; that some of the heirs who had received these forms of assignments from respondent and his agents, not caring to deal directly with the respondent, employed the firm of Catron & Catron to look after their interests in this behalf; it further appears that these heirs came to the office of Catron & Catron, bringing with them the form of the assignments set forth above; that two of their number were sent by Mr. Catron to the office of Mr. Renehan for the purpose of obtaining a list of the heirs and the amounts due them. There is a conflict in the evidence as to what happened from this point on. The witness T. B. Catron testified that he understood from Renehan, that he, Renehan, was paying Catron's clients the full amounts of their claims, and further testified that he did not look at the amounts set out in the assignments but assumed from what Renehan had said to him that the amounts which his clients were to receive from Renehan, as shown by the list, were the full amounts due, without deductions, for their proportionate shares in the grant as fixed by the decree in the partition suit; he further testified that he knew that Renehan was the agent of the purchaser and that the money for the purchase of the grant was being paid through him, and that he did not, owing to representations made to him by Renehan, read over the assignments carefully nor look at the decree in the case to learn what the fractional interests were nor make any calculations as to the amounts of money coming to his clients thereunder. The respondent, on the other hand, testified that he made no representations whatever as to the amounts on the lists being the full amounts that were due the clients of Catron & Catron, but merely that these amounts were the

sums he was willing to pay for the interests of those heirs;. he testified as to a conversation with Catron in which the latter said: "Is this all you are paying for these interests?" and on being informed that it was, that Mr. Catron stated, "See that the payment is made through me," and respondent further denied that he in any way misled Mr. Catron by any statement or that he made any representations to him that were false.

As to those heirs who were the clients of respondent, the respondent testified, and there is no direct evidence except inferences which might be drawn to the contrary, that he fully informed all of them as to just how much money they could receive from the substituted trustee, when the notes matured and how much if they would accept the cash payment immediately, instead of waiting until the notes of Tutt & Skinner should mature, which was a period of about one year. We find, in the absence of any direct testimony to the contrary, that respondent's clients fully understood the situation, signed the assignments and accepted from him the cash set forth therein as the amounts due them, and that the consideration of such acceptance of a smaller amount than they would otherwise have received, was the fact that the money was to be promptly paid in cash.

The above statement, as to those heirs admitted to be clients of respondent, applies to all of them, except Antanio Faustin Lovato, who was also concededly a client of respondent. As to the transaction between the respondent and Antonio Faustin Lovato, there is a direct conflict of testimony. It appears that Antonio Faustin was a claimant of two separate rights in the Lovato grant, one in his own name and one as assignee of Jose Maria Lovato, the latter being the owner of a very large interest in the grant and who had assigned it to Antonio Faustin for a small sum of money. It appeared that G. Volney Howard represented, as attorney at law, Jose Maria Lovato, and that he was attempting to set aside this assignment to Antonio Faustin on the ground of fraud, and to obtain a larger sum of money for his client, Jose Maria. The respondent testified that in his conference with his client,.

Antonio Faustin Lovato, in which this matter was fully discussed, he informed Antonio Faustin of all the facts in the case; that is, that Howard as the attorney for Jose Maria, was attacking the validity of the assignment, and that if suit were instituted it was impossible to tell how much Antonio Faustin would be able to obtain under this assignment from Jose Maria. Respondent further testified that he made full disclosure of the situation to Antonio Faustin and that Antonio Faustin rather than take any chances of losing all under the assignment in a contest between himself and Jose Maria, agreed with the respondent to accept the sum of two thousand dollars and to sell his own interest and also his claim under the Jose Maria assignment to the respondent, and to allow the respondent to obtain what he could on them for himself, whether it was more or less than the sum of two thousand dollars. This understanding as testified to by the respondent and the full disclosure therein made to Antonio Faustin is denied by the latter, who testified that he did not know what the amount of his interest was nor that of his assignor, Jose Maria, and that he accepted the two thousand dollars believing it was the total amount due him in his own right and as assignee without any deduction. He testified further that the assignments were not read over to him. The testimony of Antonio Domingo Lovato, the brother of Antonio Faustin, who was present at this conversation, is the only other testimony on this point bearing upon the agreement, and it is not directly corrobative of either that of the respondent or of Antonio Faustin; he testified, however, that the assignments and papers in question were read over to Antonio Faustin in his presence. There was also a letter put in evidence from the daughter of Antonio Faustin, who had, by his authority, charge of his correspondence generally, acknowledging the receipt of the two thousand dollars and expressing entire satisfaction with the transaction.

As a part of the charge in this case it is alleged that the amounts originally entered in the assignments and which amounts were paid to the various Lovatos, were subsequently raised by the respondent to correspond to the

In re Renehan, 19 N. M. 640

amounts they were rightfully entitled to receive without deduction, and that these assignments, so changed, were presented to G. Volney Howard, substituted trustee, and by him, paid, and that thereby the substituted trustee was deceived into paying to said Renehan the full amounts of said claims.

The only evidence to support this charge is found in the testimony of the substituted trustee, who states that he did not observe the amounts inserted in the assignments when checking over the same with the respondent, saying that he examined them only as to the form. The witness further testified that he had no mind or memory for figures or ability to make calculations, and that he had turned the entire matter over to the First National Bank of Santa Fe, assuming that the figures inserted in the assignments were the correct ones, and that the Lovato heirs were obtaining the full amount that they were entitled to, without deductions. The respondent testified that subsequently to the payment of these amount to him on such assignments, he was requested by the substituted trustee, G. Volney Howard, to raise the amounts so that they would correspond with the amounts actually due the Lovato heirs under the mortgage, in order that these assignments would stand as receipts for the amounts that the substituted trustee had paid out under the mortgage for the Lovato heirs. The witness, Howard, did not deny that such in truth was the case, although he was examined at length and in detail concerning it. In this state of the evidence the court can come to but one conclusion, which is that the figures in the assignments were not raised as alleged, but were raised at the request, and for the purposes, of the substituted trustee subsequent to the time of the payment of the assignments.

There is a charge that the respondent solicited persons to employ him as an attorney, but the evidence, on the contrary, we think showed that as to those Lovatos who were admittedly his clients, they had written to him and employed him on account of their dissatisfaction with other counsel, which dissatisfaction was based on the delay in obtaining the money for their interests in the grant. As to the others, the evidence, we think, does not support

the contention that the respondent solicited any of them to employ him as an attorney, his dealings with them being as hereinbefore set forth, that is, as a purchaser of their interests in the grant.

The evidence in this case was voluminous and cannot be set out at any length in this opinion. It was heard by the court in the first instance and when transcribed was read and carefully considered. The decision of the court in a case of this kind necessarily rests upon the weight given to the evidence adduced. The authorities in disbarment proceedings are not uniform as to whether such a suit is civil or criminal, and also as to the amount of proof necessary to sustain the charges. By some courts it is held that being criminal the charge should be proven beyond a reasonable doubt, and by others it is held that all that is required is that the charge be established by a preponderance of evidence, like any civil case. Some of the courts attempt to take a middle ground, as to the amount of proof required, using such phrases as "clear preponderance of evidence" and the like, but whatever view is taken of the character of the proceeding, whether civil, where the case should be established by a preponderance of evidence, or criminal, where it should be established beyond a reasonable doubt, or some middle ground, the court is of the opinion, under all the evidence submitted to it and after carefully weighing and considering it, that a case for disbarment has not been established.

We approve of the langauge used in the case, in Re Hamilton Baless, 28 Mich., 508, where the supreme court, speaking through Justice Cooley says. "While not strictly a criminal prosecution, it is of that nature, and the punishment, in prohibiting the party following his ordinary occupation, would be severe and highly penal. The majority of the court are not satisfied that the evidence gives such clear support to the charges as should be required in such cases." Again, in the case of, In Re Haymond, 53 Pac. 900, the court said: "This accusation is in the nature of a criminal charge, and all intendments are in favor of the accused. The accusation is not sufficient if, all its statements being true, the accused could be innocent. *  *  *

A construction favorable to innocence must be given, if possible." This court, in the case, In Re Catron, 8 N. M. 253, in passing upon the question of the amount of proof required in a disbarment proceeding, lays down the law as follows: "But a result which is so humiliating in its effects and so disastrous in its consequences to the respondent, should not be reached upon circumstances that appear merely suspicious, but only upon that credible and convincing testimony which will lead with reasonable certainty to the establishment of his guilt. * * * * This right and privilege (of his profession) should not be destroyed or taken from him, and he be deprived of its benefits and driven in humiliation and disgrace from his profession, unless upon reliable proof,—such proof as would be sufficient to satisfy the minds of the court in determining questions involving the liberty and property of a citizen." It would be useless to multiply authorities where the law is plain, and the question for the court is the weight to be given to the evidence, and we shall content ourselves with the above quotations.

Whether respondent is civilly liable to any of the parties who claim to have been injured by him, we do not decide. It may be that the circumstances shown in this case might authorize a recovery from the respondent by some of the parties with whom he dealt. Where a transaction between an attorney and his client, of advantage to the attorney, is called in question, in an ordinary civil action, the burden is upon the attorney to show, that not only that he used no undue influence, but that he gave his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been had the client dealt with a stranger, and slight evidence of over-reaching in such a case will justify a recision of the contract. Whether the facts in this case, however, would authorize a recovery from the respondent is not for us to decide.

Where, however, such a transaction is called in question in disbarment proceedings, where all intendments are

in favor of the accused, the rule above stated does not apply, but the burden is upon the state to clearly establish the wrong-doing of the attorney. The charges relied upon for disbarment, not having been clearly established and sustained, the information will be dismissed, and, IT IS SO ORDERED.